# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA - LAFAYETTE DIVISION

MICHAEL DESELLE and                            Case No. 6:25-cv-0835
REBECCA GUIDRY,
                        Plaintiffs

v.                                             Judge: David C. Joseph

LAFAYETTE CITY-PARISH
CONSOLIDATED GOVERNMENT,                       Magistrate Judge: David J. Ayo
                        Defendant

**MEMORANDUM IN SUPPORT OF
RULE 12(b)(1) AND 12(b)(6) MOTION TO DISMISS FOR LACK OF SUBJECT-
MATTER JURISDICTION (STANDING) AND FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 2

LEGAL STANDARD ............................................................................................... 5

LAW AND ARGUMENT .......................................................................................... 6

   I.   The Court should dismiss DeSelle and Guidry because, without personal or direct ownership of the relevant properties, they lack constitutional standing. ............................ 6

   II.  Regardless of whether DeSelle and Guidry have constitutional standing, the Court should dismiss their individual claims for lack of prudential standing ............................. 8

   III. The Ordinance regulating short-term rentals does not violate the Takings Clause............ 9

      A.  The Ordinance is not a per se taking because LCG has not permanently physically invaded the properties or denied all economically beneficial use of plaintiffs' properties. ........................................................11

          1.  The Ordinance is not a permanent physical invasion of plaintiffs' properties; instead, plaintiffs allege the Ordinance actually prevents physical invasion.....................................................................................11

          2.  Plaintiffs do not allege the Ordinance deprives them of all economically beneficial use of their properties.................................... 12

      B.  The Ordinance does not qualify as a regulatory taking under the Penn Central factors...................................................................................... 13

          1.  Any economic impact is not severe enough to be a regulatory taking. ......... 13

          2.  The Ordinance does not interfere with reasonable investment-backed expectations.............................................................................. 15

          3.  The Ordinance's character is a means of promoting common good and does not effect any physical invasion of plaintiffs' properties. ............... 17

   IV. The Ordinance does not violate the Equal Protection Clause. ........................................ 19

      A.  Plaintiffs fail to allege the existence of similarly situated persons who are treated differently from them. ...................................................................... 19

          1.  Short-term rental operators are not similar to long-term landlords. .............. 20

          2.  Residential Single-Family neighborhoods are not similarly situated to Agricultural, Mixed-Use, Commercial, or other neighborhoods.................... 21

          3.  Most Lafayette homeowners are equally restricted from operating short-term rentals. ..................................................................... 21

      B.  The Ordinance advances a legitimate government interest. ....................................... 22

CONCLUSION.......................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abraugh v. Altimus*,
26 F.4th 298 (5th Cir. 2022) .................................................................... 6, 9

*Ali v. New York City Env't Control Bd.*,
670 F. App'x 26 (2d Cir. 2016) ................................................................ 8

*Andrus v. Allard*,
444 U.S. 51 (1979) ................................................................ 8, 10, 14, 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................ 6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................ 6

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*,
49 F.4th 520 (5th Cir. 2022) ................................................................ 6

*Campbell v. Rainbow City, Ala.*,
434 F.3d 1306 (11th Cir. 2006) ................................................................ 21

*Carbon Six Barrels, L.L.C. v. Proof Rsch., Inc.*,
83 F.4th 320 (5th Cir. 2023) ................................................................ 9

*Carroll v. Nakatani*,
342 F.3d 934 (9th Cir. 2003) ................................................................ 8

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) ................................................................7, 11, 12

*Chavez v. Plan Benefit Servs., Inc.*,
108 F.4th 297 (5th Cir. 2024) ................................................................ 5, 6

*Cibolo Waste, Inc. v. City of San Antonio*,
718 F.3d 469 (5th Cir. 2013) ................................................................ 9

*Clubside, Inc. v. Valentin*,
468 F.3d 144 (2d Cir. 2006) ................................................................ 21

*Coal Co. v. Mahon*,
260 U.S. 393 (1922) ................................................................ 10

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*,
    508 U.S. 602 (1993)..................................................................................................... 14

*Custom Seal, Inc. v. Duro-Last Roofing, Inc.*,
    No. 6:11-CV-122, 2012 WL 12930886 (E.D. Tex. Sept. 20, 2012)................................... 17

*Degan v. Bd. of Trs. of Dallas*,
    No. 3:17-CV-01596, 2018 WL 4026373 (N.D. Tex. Mar. 14, 2018)................................. 17

*Ensley v. Cody Res., Inc.*,
    171 F.3d 315 (5th Cir. 1999) ........................................................................................ 6

*Ewing v. City of Carmel-By-The-Sea*,
    286 Cal. Rptr. 382 (Cal. Ct. App. 1991) .................................................................. 20, 22

*Fifth Third Bancorp v. Dudenhoeffer*,
    573 U.S. 409 (2014)..................................................................................................... 6

*Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*,
    493 U.S. 331 (1990)..................................................................................................... 9

*Fund Liquidation Holdings LLC v. Bank of Am.*,
    991 F.3d 370 (2d Cir. 2021) ......................................................................................... 7

*In re Great Lakes Dredge & Dock Co.*,
    624 F.3d 201 (5th Cir. 2010)........................................................................................ 6

*Hadacheck v. Sebastian*,
    239 U.S. 394 (1915)................................................................................................... 15

*Hanewinckel v. Appelbaum*,
    No 15-766, 2016 WL 5661983 (D. Del. Sept. 29, 2016).................................................. 22

*Hause v. City of Fayetteville, Arkansas*,
    No. 5:24-CV-5143, 2024 WL 5177512 (W.D. Ark. Dec. 19, 2024) ....................... 13, 18, 19

*Hignell v. City of New Orleans*,
    476 F. Supp. 3d 369 (E.D. La. 2020) ............................................................................ 15

*Horne v. Dep't of Agric.*,
    576 U.S. 350 (2015)....................................................................................................11

*Hutto v. City of Rock Hill*,
    No. 23-CV-0970, 2025 WL 1189761 (D.S.C. Mar. 4, 2025) ............................................. 24

*Jackson Court Condominiums, Inc. v. City of New Orleans,*
874 F.2d 1070 (5th Cir. 1989) ............................................................ 19, 23, 24

*Jackson v. City of Houston,*
143 F.4th 640 (5th Cir. 2025) ............................................................... 7, 8

*Kaiser Aetna v. United States,*
444 U.S. 164 (1979) ................................................................................ 11

*Landgraf v. USI Film Prod.,*
511 U.S. 244 (1994) ................................................................................ 17

*Lingle v. Chevron U.S.A., Inc.,*
544 U.S. 528 (2005) ................................................................................ 10

*Loretto v. Teleprompter Manhattan CATV Corp.,*
458 U.S. 419 (1982) ............................................................................ 10, 11

*Lucas v. S.C. Coastal Council,*
505 U.S. 1003 (1992) .............................................................................. 15

*Madriz-Alvarado v. Ashcroft,*
383 F.3d 321 (5th Cir. 2004) .................................................................. 24

*Marceaux v. Lafayette City-Par. Consol. Gov't,*
921 F. Supp. 2d 605 (W.D. La. 2013) ..................................................... 19

*Marfil v. City of New Braunfels, Tex.,*
No. 6:20-CV-00248, 2025 WL 243028 (W.D. Tex. Jan. 10, 2025)........... 24

*Maritans, Inc. v. United States,*
51 Fed. Cl. 277 (2001) ............................................................................ 14

*MHC Fin. Ltd. P'ship v. City of San Rafael,*
714 F.3d 1118 (9th Cir. 2013) ................................................................ 15

*Mogan v. City of Chicago,*
No. 21 C 1846, 2022 WL 4181783 (N.D. Ill. Sept. 12, 2022)................. 14

*Moore v. Bryant,*
853 F.3d 245 (5th Cir. 2017) .................................................................... 6

*Moskovic v. City of New Buffalo,*
638 F. Supp. 3d 770 (W.D. Mich. 2022) ............................................ 18, 20

*Murphy v. Walworth Cnty.*,
    383 F. Supp. 3d 843 (E.D. Wis. 2019) ................................................ 20, 24

*Murr v. Wisconsin*,
    582 U.S. 383 (2017) ...................................................................... 14

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ....................................................................... 5, 6

*Nekrilov v. City of New Jersey*,
    45 F.4th 662 (3d Cir. 2022) ......................................................... *passim*

*Norman v. United States*,
    63 Fed. Cl. 231 (2004) ................................................................... 14

*Pace Res., Inc. v. Shrewsbury Twp.*,
    808 F.2d 1023 (3d Cir. 1987) ................................................... 14, 15, 16

*Pelletier v. Victoria Air Conditioning, Ltd.*,
    780 F. App'x 136 (5th Cir. 2019) ...................................................... 8

*Penn Central Transp. Co. v. New York City*,
    438 U.S. 104 (1978) ..................................................................... *passim*

*Pulte Home Corp. v. Mongomery Cnty., Md.*,
    909 F.3d 685 (4th Cir. 2018) ........................................................... 15

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984) ....................................................................... 16

*Santiago–Ramos v. Autoridad de Energía Eléctrica de Puerto Rico, AEE*,
    834 F.3d 103 (1st Cir. 2016) ............................................................. 7

*Schafer v. City of New Orleans*,
    743 F.2d 1086 (5th Cir. 1984) .......................................................... 23

*Seminole Tribe of Fla. v. Stranburg*,
    799 F.3d 1324 (11th Cir. 2015) ........................................................ 22

*Sheetz v. Cnty. of El Dorado, Cal.*,
    601 U.S. 267 (2024) ..................................................................... 7, 12

*Short Term Rental Owners Ass'n of Ga., Inc. v. Cooper*,
    515 F. Supp. 3d 1331 (N.D. Ga. 2021) ................................................ 24

*SonicSolutions Algae Control, LLC v. Diversified Power Int'l*,
    722 F. Supp. 3d 16 (D. Mass. 2024) ...................................................... 9

*Styller v. Zoning Bd. of Appeals of Lynnfield*,
    169 N.E.3d 160 (Mass. 2021) ............................................................... 23

*Superior MRI Servs. Inc. v. All. Healthcare Servs.*,
    778 F.3d 502 (5th Cir. 2015) ............................................................... 8

*Terrace v. Thompson*,
    263 U.S. 197 (1923) ............................................................................ 22

*Tex. Ent. Ass'n, Inc. v. Hegar*,
    10 F.4th 495 (5th Cir. 2021) ............................................................... 19

*Thole v. U.S. Bank N.A.*,
    590 U.S. 538 (2020) ............................................................................ 5

*Treme v. St. John the Baptist Par. Council*,
    93 F.4th 792 (5th Cir. 2024) ............................................................... 7

*United States v. Cartwright*,
    411 U.S. 546 (1973) ............................................................................ 14

*United States v. Hays*,
    515 U.S. 737 (1995) ............................................................................ 8

*Vill. of Euclid v. Ambler Realty Co.*,
    272 U.S. 365 (1926) ................................................................ 15, 19, 23

*Weisenberg v. Town Bd. of Shelter Island*,
    404 F. Supp. 3d 720 (E.D.N.Y. 2019) ............................................. 20, 21

*Yur-Mar, L.L.C. v. Jefferson Par. Council*,
    451 F. App'x 397 (5th Cir. 2011) ................................................. 11, 19

**US CONSTITUTIONAL PROVISIONS**

Amendment V .......................................................................................... 10

**STATUTES**

La. Civ. Code art. 24 ............................................................................... 9

La. Stat. § 12:1303 .................................................................................. 9

La. Stat. § 12:1320 ................................................................................................................ 9

**FEDERAL RULES**

Fed. R. Civ. P. 12 ............................................................................................................. 1, 6

Fed. R. Civ. P. 17 ............................................................................................................. 6, 9

**OTHER AUTHORITIES**

Emily Peck and Charles Maldonado, *How Airbnb is pushing locals from New Orleans' coolest neighborhoods: 'We're out of here,'* HUFFPOST AND THE LENS (Nov. 4, 2017), available at https://www.nola.com/how-airbnb-is-pushing-locals-from-new-orleans-coolest-neighborhoods-were-out-of-here/article_f9323868-97cf-5728-a22f-10276ae156a1.html ............................................... 22

Tom Perkins, *'Like a ghost town': how short-term rentals dim New Orleans' legacy*, THE GUARDIAN (March 13, 2019), available at  https://www.theguardian.com/us-news/2019/mar/13/new-orleans-airbnb-treme-short-term-rentals ....................................... 22

## INTRODUCTION

Under Rule 12(b)(1) and 12(b)(6), the Lafayette City-Parish Consolidated Government ("LCG") asks the Court to dismiss all claims on two grounds.

*First,* the Court should dismiss the claims individually brought by Michael DeSelle and Rebecca (Becky) Guidry because they do not own the properties at issue and thus lack constitutional or prudential standing to pursue the claims they assert. The LLC plaintiffs, which have independent legal capacity, own the properties. And DeSelle is only one member of StellaRising, LLC (which owns the Saint Joseph property), and Guidry is only one member of the EPH320, LLC (which owns the Steeple Chase property). Because their individual claims depend on property ownership, DeSelle and Guidry do not have constitutional or prudential standing, and they should be dismissed.[1]

*Second*, the Court should dismiss all claims for failure to state a claim on which relief can be granted because there is no civil rights violation here. Challenging Lafayette's ordinance governing operation of short-terms rentals ("Ordinance"),[2] plaintiffs bring three claims under two constitutional provisions. First, plaintiffs allege that the Ordinance's prohibition on short-term rentals in "Residential Single-Family" zones is a "per se taking" and unconstitutional under the Takings Clause of the Fifth Amendment.[3] Second, if the Ordinance is not a per se taking, plaintiffs contend it must be a "regulatory taking" and still unconstitutional.[4] Third, plaintiffs allege that, by allowing permitted short-term rentals outside of Residential Single-Family zones, but prohibiting

---

[1]    LCG's counsel asked plaintiffs' counsel to dismiss DeSelle and Guidry's individual claims without prejudice before filing this motion, but plaintiffs' counsel declined.

[2]    *See generally* **Ex. A**, Lafayette's Code of Ordinances § 73.

[3]    R. Doc. 12 at 22–27 ¶¶ 78–100 (Count One).

[4]    R. Doc. 12 at 27–30 ¶¶ 101–109 (Count Two).

short-term rentals in Residential Single-Family zones, the Ordinance violates the Equal Protection Clause of the Fourteenth Amendment by differently treating owners of different properties in different municipal zones—which plaintiffs allege by conclusion are "similarly situated."[5] Plaintiffs are wrong on all counts, and their constitutional claims should be dismissed.

## BACKGROUND

Lafayette is divided into thirteen different municipal zoning districts, which are subject to different zoning regulations: (1) "A" Agricultural, (2) "RS-1" Residential Single-Family, (3) "RS-2" Residential Single-Family, (4) "RM" Residential Mixed, (5) "MN" Mixed-Use Neighborhood, (6) "MX" Mixed-Use Center, (7) "D" Downtown, (8) "CM" Commercial Mixed, (9) "CH" Commercial Heavy, (10) "PI-L" Public/Institutional-Light, (11) "PI-H" Public/Institutional-Heavy, (12) "IL" Industrial Light, and (13) "IH" Industrial Heavy.[6] Some districts are further divided into different subdistricts, where "dimensional and development standards [also] differ."[7]

For example, the Agricultural districts are purposely limited to areas with "low residential densities, and commercial areas [that] are small in scale and either buffered from residential uses or integrated with a conservation design development."[8] Mixed-Use Neighborhood districts "provide[] a transition between residential areas and more intense commercial corridors," subject to various property regulations for the "neighborhood retail, convenience, service, office, and institutional" spaces allowed to operate there.[9] The Downtown district is the "highest density and

---

[5]        R. Doc. 12 at 30–33 ¶¶ 110–118 (Count Three).

[6]        **Ex. B**, Lafayette Development Code at 62; *see also* at *id.* 15 ("[T]his Chapter establishes the zoning districts for the City of Lafayette, the regulations that apply to each district, and a comprehensive list of uses [in] the 'Use Table.'").

[7]        *Id.* at 15.

[8]        *Id.* at 17.

[9]        *Id.* at 22–24.

intensity in the City and Parish, and [LCG regulation] preserves its unique character and function . . . characterized by human activity and interaction."[10] Meanwhile, the Residential Single-Family districts "provid[e] for predominantly detached, single family neighborhoods," marked by significant green space and various regulations on any "non-residential uses" and nearby commercial operations.[11]

For instance, LCG prohibits any "auto and truck repair" from operating within 50 feet of the Residential Single-Family districts.[12] Though property owners in Residential Single-Family districts may operate a Bed & Breakfast in specifically designated historic places, "[t]he owner/operator must live in the principal structure," provide "one parking space for each guest room [only] in the rear of the property and . . . screened from adjacent properties," and cannot host "[r]eceptions or private parties for a fee on the premises."[13] LCG also regulates "home occupations" to "protect[] and maintain[] the residential character of established neighborhoods while recognizing that particular professional and limited business activities are traditionally and inoffensively carried on in the home."[14] So "an artist, craftsman, musician, photographer, seamstress, tailor, [or] writer" may maintain a home office "occupy[ing] up to 10% of the gross floor area of the dwelling unit."[15] Their services "are limited to 1 client at a time," with "[n]o more than 10 customer or service visits . . . per day."[16] No business may be conducted or open to the public after 10:00 p.m. or before 8:00 a.m., and the business operations must "not create or

---

[10]     *Id.* at 26–27.

[11]     *Id.* at 21.

[12]     *Id.* at 251.

[13]     *Id.* at 252.

[14]     *Id.* at 257.

[15]     *Id.* at 258.

[16]     *Id.* at 259.

contribute to the creation of offensive noise, vibrations, smoke, dust, fumes, odors, heat glare, x-ray, electrical disturbance, or interference to radio and/or television."[17]

Consistent with its use regulation of municipal zones, LCG allows property owners to operate short-term rentals according to a specified permitting process, but only in certain districts: "The operation of a short-term rental is only permitted in zoning districts which contain a 'P*' in the short-term rental use category of Table 89-21-2 of the Lafayette Development Code."[18] This means property owners may operate short-term rentals in only nine of Lafayette's thirteen districts: (1) "A" Agricultural, (2) "RM" Residential Mixed, (3) "MN" Mixed-Use Neighborhood, (4) "MX" Mixed-Use Center, (5) "D" Downtown, (6) "CM" Commercial Mixed, (7) "CH" Commercial Heavy, (8) "IL" Industrial Light, and (9) "IH" Industrial Heavy.[19] Property owners in "RS-1" Residential Single-Family, "RS-2" Residential Single-Family, "PI-L" Public/Institutional-Light, or "PI-H" Public/Institutional-Heavy zones may not operate short-term rentals at all.[20]

The plaintiffs in this case are Michael DeSelle, StellaRising LLC, Rebecca (Becky) Guidry, and EPH320, LLC, each of whom represent they "own" properties subject to the Ordinance.[21] But the LLCs are the only residential property owners that the Ordinance affects. DeSelle has *never* directly or personally owned the Saint Joseph property. StellaRising LLC bought the property in May 2022 and owns it today.[22] DeSelle is only one member of StellaRising LLC, which has at

---

[17]    *Id.* at 259.

[18]    **Ex. A**, Lafayette's Code of Ordinances § 73-3.

[19]    *Compare id.*, *with* **Ex. B**, Lafayette Development Code at 63 (Table 89-21-2 Use Table).

[20]    **Ex. B**, Lafayette Development Code at 63 (Table 89-21-2 Use Table).

[21]    R. Doc. 12 at 17–18 ¶¶ 65–66 (DeSelle); *id.* at 20 ¶¶ 71–72 (Guidry).

[22]    **Ex. C**, May 5, 2022 Cash Deed transferring 527 St. Joseph Street; **Ex. D**, Lafayette Parish Tax Assessor Property Report for 527 St. Joseph Street.

least one other member, Stacy E. Elias.[23] So the only "property" DeSelle owns is an LLC membership interest. Similarly, Guidry has *never* directly or personally owned the Steeple Chase property. Guidry's father, John Venable, previously owned it, but upon his death, specified all his assets would be divided among Guidry, Guidry's sister (Venable's daughter), and Guidry's nephew (Venable's grandson) with special needs.[24] Acting as Venable's succession representative, however, Guidry instead gifted the Steeple Chase property to EPH320, LLC in August 2022.[25] Guidry is only one member of EPH320, LLC, which has at least one other member, Lonnie Guidry.[26] So the only "property" Guidry owns is an LLC membership interest.

## LEGAL STANDARD

"Federal courts have a continuing obligation to address jurisdictional defects," such as "[c]onstitutional standing."[27] To have constitutional standing, a plaintiff must "demonstrate (1) that [the plaintiff] suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief."[28] Standing is "an indispensable part of [a] plaintiff's case."[29] And "standing is not dispensed in gross."[30] Each plaintiff "must demonstrate standing for each claim . . . against each defendant, and for each form of relief" and must maintain standing "throughout the litigation

---

[23]    **Ex. E**, Louisiana Secretary of State Business Records for StellaRising, LLC at 5–6.

[24]    *See* **Ex. F**, April 27, 2022 Recorded Last Will and Testament of John Herman Venable.

[25]    **Ex. G**, August 11, 2022 Donation Inter Vivos transferring 102 Steeple Chase Drive; **Ex. H**, Lafayette Parish Tax Assessor Property Report for 102 Steeple Chase Drive.

[26]    **Ex. I**, Louisiana Secretary of State Business Records for EPH320, LLC at 2–3, 5.

[27]    *Chavez v. Plan Benefit Servs., Inc.*, 108 F.4th 297, 307 (5th Cir. 2024).

[28]    *Id.* (quoting *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020)).

[29]    *Id.*

[30]    *Murthy v. Missouri*, 603 U.S. 43, 44 (2024).

proceedings."[31] Otherwise, the claim should be dismissed for lack of subject-matter jurisdiction.[32]

Federal courts must also "weed[] out meritless claims" at the pleading stage so as to not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."[33] When a complaint fails to "state a claim to relief that is plausible on its face," it must be dismissed.[34] "[C]onclusory allegations, unwarranted factual inferences, or legal conclusions" do not create plausible claims.[35] Plausibility depends only on "well-pleaded facts"[36] that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[37]

Prudential standing also implicates the court's 12(b)(6) analysis by asking "who, according to the governing substantive law, is entitled to enforce the right?"[38] "[A]n action must be prosecuted in the name of the real party in interest[,] [a]nd a violation of this rule is a failure of prudential standing."[39] So prudential standing "goes . . . to the validity of the cause of action."[40]

## LAW AND ARGUMENT

### I. The Court should dismiss DeSelle and Guidry because, without personal or direct ownership of the relevant properties, they lack constitutional standing.

"Standing often turns on the nature and source of the claim asserted[] [b]ecause different

---

[31]    *Id.*; *Chavez*, 108 F.4th at 307.

[32]    *Moore v. Bryant*, 853 F.3d 245, 248 n.2 (5th Cir. 2017) ("Dismissals for lack of Constitutional standing are granted pursuant to Rule 12(b)(1).").

[33]    *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014); *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

[34]    *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[35]    *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 525 (5th Cir. 2022).

[36]    *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 210 (5th Cir. 2010).

[37]    *Iqbal*, 556 U.S. at 678.

[38]    *Abraugh v. Altimus*, 26 F.4th 298, 304 (5th Cir. 2022).

[39]    *Id.* (quoting Fed. R. Civ. P. 17(a)(1); *Ensley v. Cody Res., Inc.*, 171 F.3d 315, 320 (5th Cir. 1999)).

[40]    *Id.*

claims protect against different injuries."[41]

Starting with the takings claim, the Takings Clause generally protects "property owners."[42] When a taking occurs, the government must "provide the [taken property's] *owner* with just compensation."[43] As the Fifth Circuit explains, Article III standing for a takings claim "requires that plaintiffs have an interest in the property [taken,] at the time of the alleged taking."[44] In other words, plaintiffs "must demonstrate they have a 'protectable property interest' . . . in *the property at issue*."[45] Sister circuits agree: without "an identifiable personal stake in the property rights at issue," plaintiffs cannot "establish an injury in fact for purposes of [the] Takings Clause" and thus lack constitutional standing to bring a claim.[46] Nor would any injury be redressable when the Takings Clause requires just compensation be paid to the holder of the protected property interest, rather than the owner or member of the corporate holder of the protected property interest.[47]

Here, neither DeSelle nor Guidry have a protectable property interest—like ownership, lessee rights, or the like—in the Saint Joseph or Steeple Chase properties. Instead, DeSelle and Guidry own only partial membership interests in the LLCs that own the properties,[48] and LLC interests are not the "property at issue" alleged have been taken. The LLCs have independent legal

---

[41]    *Jackson v. City of Houston*, 143 F.4th 640, 645–46 (5th Cir. 2025).

[42]    *See* R. Doc. 12 at 22 ¶ 80 ("[T]he Takings Clause saves individual property owners from bearing public burdens . . . ." (quoting *Sheetz v. Cnty. of El Dorado, Cal.*, 601 U.S. 267, 273–74 (2024)).

[43]    R. Doc. 12 at 23 ¶ 82 (emphasis added) (quoting *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021)).

[44]    *Treme v. St. John the Baptist Par. Council*, 93 F.4th 792, 797 (5th Cir. 2024).

[45]    *Id.* at 796 (emphasis added).

[46]    *Santiago–Ramos v. Autoridad de Energía Eléctrica de Puerto Rico, AEE*, 834 F.3d 103, 106 (1st Cir. 2016); *see also Fund Liquidation Holdings LLC v. Bank of Am.*, 991 F.3d 370, 385 (2d Cir. 2021) ("Only the owner of an interest in property at the time of the alleged taking has standing to assert that a taking has occurred." (alterations omitted)).

[47]    *See generally Cedar Point Nursery*, 594 U.S. at 147.

[48]    *See supra* notes 26–31 and accompanying text.

capacity to sue over the properties they own and, in fact, are already plaintiffs with identical claims. "[T]here is no standing to assert a takings claim [if the property at issue is] owned by others."[49]

The same is true for DeSelle and Guidry's equal-protection claim, asserted under the guise of being "property owners who own single-family residences" subject to the Ordinance when they are not.[50] "To have standing to bring an equal protection claim, a plaintiff must have suffered an injury [in fact] that stemmed from unequal treatment."[51] This typically requires a plaintiff to "hav[e] *personally* been denied equal treatment."[52] The Fifth Circuit holds that "an individual member of an LLC d[oes] not have standing to sue a third party for economic harms allegedly suffered by the LLC . . . even where that individual is the sole [LLC member]."[53] "[A]n LLC and its owner or members are not interchangeable for the purposes of standing," so an LLC member cannot pursue civil rights claims based on an ordinance impacting property owned by the LLC.[54] DeSelle and Guidry lack standing to bring the claims they assert, and they should be dismissed.

## II. Regardless of whether DeSelle and Guidry have constitutional standing, the Court should dismiss their individual claims for lack of prudential standing.

Even if DeSelle and Guidry could satisfy constitutional standing, they lack prudential standing, which still warrants dismissal of their individual claims.[55] Prudential standing prohibits

---

[49]    *Andrus v. Allard*, 444 U.S. 51, 64 n.21 (1979).

[50]    *E.g.*, R. Doc. 12 at 31 ¶ 113.

[51]    *Jackson v. City of Houston*, 143 F.4th 640, 646 (5th Cir. 2025) (collecting cases).

[52]    *Id.* (emphasis added) (quoting *Carroll v. Nakatani*, 342 F.3d 934, 946 (9th Cir. 2003) and *United States v. Hays*, 515 U.S. 737, 743 (1995)).

[53]    *Pelletier v. Victoria Air Conditioning, Ltd.*, 780 F. App'x 136, 141 (5th Cir. 2019) (affirming dismissal because plaintiff "did not establish that he personally owned [the property at issue] and he offered no other valid cause of action for his personal claim against [defendants]").

[54]    *Ali v. New York City Env't Control Bd.*, 670 F. App'x 26, 27 (2d Cir. 2016) ("Ali lacked standing. Mohammedi Property Management, LLC . . . owned the building, and Ali could not sue based on injuries stemming from the City's [allegedly improper actions toward] Mohammedi Property.").

[55]    *See Superior MRI Servs. Inc. v. All. Healthcare Servs.*, 778 F.3d 502, 504 (5th Cir. 2015) ("Prudential standing requirements exist in addition to the immutable requirements of Article III.").

8

plaintiffs from litigating, for example, third-party legal rights or claims outside the zone of interests protected by the relevant statute or provision.[56] At bottom, the prohibition against third-party standing searches for the "real party in interest" with legal capacity under Rule 17.[57]

In Louisiana, a "juridical person" like an LLC has a "personality"—and capacity—"distinct from that of its members."[58] LLCs have the "power to . . . [s]ue and be sued, complain and defend in its corporate name[, and] . . . acquire and own, hold, improve, use, and otherwise deal with real or personal property, or any interest in property, wherever located."[59] As a result, a member of an LLC "is not a proper party to a proceeding by or against [the LLC]."[60] This is true across the country,[61] and often manifests in the prudential-standing prohibition against "shareholder standing"—a "longstanding equitable restriction that generally prohibits shareholders from initiating actions to enforce the rights of [a corporate entity] unless the [entity's] management has refused to pursue the same action."[62] Here, however, the LLCs that own the properties at issue are themselves plaintiffs asserting identical claims. DeSelle and Guidry should be dismissed.

## III. The Ordinance regulating short-term rentals does not violate the Takings Clause.

The Takings Clause provides that private property cannot "be taken for public use, without

---

[56]    *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 474 (5th Cir. 2013).

[57]    *Abraugh v. Altimus*, 26 F.4th 298, 304 (5th Cir. 2022).

[58]    La. Civ. Code art. 24.

[59]    *Compare* La. Stat. § 12:1303, *with* § 12:1-302(1), (4).

[60]    La. Stat. § 12:1320(B); *see also Carbon Six Barrels, L.L.C. v. Proof Rsch., Inc.*, 83 F.4th 320, 326 (5th Cir. 2023) ("Louisiana law goes so far as to generally prohibit even *members* of an LLC from suing on the company's behalf.").

[61]    *E.g.*, *SonicSolutions Algae Control, LLC v. Diversified Power Int'l*, 722 F.Supp.3d 16, 39 (D. Mass. 2024) ("When an LLC suffers injury, the proper entities to complain are the LLCs that directly suffered harm, not its member-owners, who only indirectly suffered harm.").

[62]    *Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990).

just compensation."[63] Constitutionally prohibited takings come in two forms: per se takings, "direct government appropriation or physical invasion of private property"; and regulatory takings, when "governmental regulation of private property [is] . . . so onerous that its effect is tantamount to a direct appropriation or ouster."[64]

A regulation is a per se taking in only two narrow instances: (1) when the government "requires an owner to suffer a permanent physical invasion of her property," or (2) when a regulation "completely deprive[s] an owner of '*all* economically beneficial us[e]' of her property."[65] To determine whether a regulation is a regulatory taking, courts apply the balancing test set forth in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978), which weighs three factors: (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with the [claimant's] distinct investment-backed expectations," and (3) "'the character of the governmental action' [as in,] whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.'"[66]

"[G]overnment regulation—by definition—involves the adjustment of rights for the public good" and often "curtails some potential for the use or economic exploitation of private property."[67] "Government could hardly go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."[68] As a result, the Fifth

---

[63]    U.S. Const. amend. V; *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 536 (2005).

[64]    *Lingle*, 544 U.S. at 537 (citing *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).

[65]    *Id.* at 538 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)).

[66]    *Id.* at 538–39 (quoting *Penn. Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)).

[67]    *Andrus*, 444 U.S. at 65.

[68]    *Id.*

Circuit makes clear that an "adverse effect on economic value will be tolerated in the interest of promoting the health, safety, welfare or morals of a community."[69] And "'land-use restrictions or controls to enhance the quality of life by preserving the character and desirable aesthetic features of a city' are not generally takings."[70]

### A. The Ordinance is not a per se taking because LCG has not permanently physically invaded the properties or denied all economically beneficial use of plaintiffs' properties.

Plaintiffs allege the Ordinance is a per se taking because it appropriates their rights to lease and "to include" others on their properties on a short-term basis.[71] But plaintiffs do not allege a single fact plausibly showing that the Ordinance has resulted in a permanent physical invasion of their properties or deprived them of *all* economically beneficial use, as precedents require.

### 1. The Ordinance is not a permanent physical invasion of plaintiffs' properties; instead, plaintiffs allege the Ordinance actually prevents physical invasion.

Plaintiffs perfunctorily assert that LCG's "action is most naturally characterized as effecting a physical invasion."[72] Courts evaluating takings claims define physical invasion to include the government's physical occupation of or physical intrusion on private property by, for example, imposing an easement or servitude or appropriating the property for third party access (in other words, giving a third party the right to physically intrude).[73] Here, plaintiffs do not allege

---

[69]    *Yur-Mar, L.L.C. v. Jefferson Par. Council*, 451 F. App'x 397, 400 (5th Cir. 2011).

[70]    *Id.* (citing *Penn. Cent. Transp. Co.*, 438 U.S. at 129).

[71]    R. Doc. 12 at 24–25, 29–30 ¶¶ 90, 94, & 107.

[72]    *Id.* ¶ 107.

[73]    *See, e.g.*, *Cedar Point Nursery*, 594 U.S. at 152 (holding appropriating right of access, allowing union organizers to traverse property, was a per se physical taking because it appropriated "a right to *physically* invade the growers' property" (emphasis added)); *Horne v. Dep't of Agric.*, 576 U.S. 350, 361 (2015) (finding per se taking when the government required raisin growers to transfer actual raisins, and ownership, to the government); *Loretto*, 458 U.S. at 438 (finding per se taking when state law required landlords to permit direct, physical attachment of permanent cable installations); *Kaiser Aetna v. United States*, 444 U.S. 164, 179–80 (1979) (finding taking when

the Ordinance has or will result in either the government or a third party physically occupying or intruding on their properties. In fact, plaintiffs assert the exact opposite: they contend the Ordinance *prevents* third parties from physically intruding on their properties by excluding short-term renters' potential access.[74] No court has held that a regulation *preventing* physical intrusion onto property is, instead, a physical intrusion and therefore a per se taking.

While plaintiffs interpret the Supreme Court's decisions in *Cedar Point Nursery* and *Sheetz* to hold that the regulatory-taking analysis has "no place" here and mere regulation of property ownership "is a per se taking that automatically triggers the right to compensation," neither case says this.[75] *Cedar Point Nursery* specifically holds that "[w]henever a regulation results in a *physical* appropriation of property, a per se taking has occurred, and *Penn Central* has no place."[76] Likewise, *Sheetz* says "the right to compensation is triggered if [States] *physically* appropriate property or otherwise interfere with the owner's right to exclude others from it [because] [t]hat sort of intrusion on property rights is a per se taking."[77] The Court's focus in both cases is on regulation that forces *physical* intrusion—not metaphorical interference with property rights. That's why the Court has articulated two different takings analyses. Plaintiffs fail to state a claim for a per se taking based on physical intrusion, and any such claim should be dismissed.

 2. *Plaintiffs do not allege the Ordinance deprives them of all economically beneficial use of their properties.*

Similarly, plaintiffs do not allege that the Ordinance has deprived them of *all* economically

---

 government-imposed navigational servitude caused "an actual physical invasion of the privately owned marina" by public).

[74]  R. Doc. 12 at 23 ¶ 85 ("The Short-Term Rental Ordinance . . . appropriates . . . [the owners'] right to lease their property and to include others on the property on a short-term basis.").

[75]  *Id.* at 23 ¶ 84.

[76]  594 U.S. at 149 (emphasis added).

[77]  601 U.S. at 274 (emphasis added).

beneficial use of their properties. Although plaintiffs allege the value of their properties has diminished and they realize less overall income from traditional long-term rental arrangements, plaintiffs admit their properties still have economically beneficial uses.[78] For example, plaintiffs can still lease their properties for periods of 30 days or more or sell them.[79] Plaintiffs can also live in the properties (and thus avoid any added costs of owning multiple homes).  Because plaintiffs can still use and economically benefit from their properties, the Ordinance does not deprive them of *all* economically beneficial uses, as the law requires to recognize a per se taking. So plaintiffs cannot state a claim of per se taking on this basis either, and any such claim should be dismissed.[80]

**B.**    ***The Ordinance does not qualify as a regulatory taking under the Penn Central factors.***

Though plaintiffs alternatively assert the Ordinance constitutes a regulatory taking under the *Penn Central* balancing test, none of the *Penn Central* factors supports a regulatory taking.[81]

*1.    Any economic impact is not severe enough to be a regulatory taking.*

Merely parroting the legal standard, plaintiffs assert that their property values have "substantially diminished" and contend that they have lost short-term rental income.[82] But because plaintiffs do not allege any facts to show that their property values have actually diminished and admit that their properties retain economically beneficial uses, the Ordinance's economic impact is severe enough to be a regulatory taking.

---

[78]    *See, e.g.*, R. Doc. 12 at 19, 21, 29 ¶¶ 68, 73, & 105.

[79]    *Id.*

[80]    *See, e.g., Nekrilov v. City of New Jersey*, 45 F.4th 662, 669–78 (3d Cir. 2022) (affirming dismissal of per-se-taking claim for short-term rental ordinance); *Hause v. City of Fayetteville, Arkansas*, No. 5:24-CV-5143, 2024 WL 5177512, at *13 (W.D. Ark. Dec. 19, 2024) (dismissing per-se-taking claim for short-term rental ordinance because plaintiffs had "not alleged any physical invasion of their house" or "that the Ordinance deprive[d] them of all economically beneficial use").

[81]    *See* R. Doc. 12 at 27–30 ¶¶ 101–09.

[82]    *Id.* at 29 ¶ 105.

In determining economic impact, courts "compare the value that has been taken from the property with the value that remains in the property."[83] "The focus of this factor is on the change in the *fair market value* of the subject property caused by the regulatory imposition."[84] Courts find Takings Clause violations only when a regulation severely diminishes the property's fair market value.[85] Unless a regulation "destroys or severely diminishes the [property's] value," courts will uphold the regulation "even if [it] prohibits a beneficial use to which certain parcels had been devoted and thus causes substantial individualized harm."[86] A regulation is not a taking solely because it deprives the owner of the property's most beneficial use or uses.[87]

Here, DeSelle alleges that, since shifting from short-term to long-term leases, he (but actually, StellaRising LLC) has "realized less than one-third of the income he obtained from . . . short-term leases" and has not yet been able to sell his property for the price he wants.[88] DeSelle does not, however, share the appraised fair market value of the property—before or after the Ordinance's enactment. Guidry similarly alleges that she (but actually, EPH320, LLC) "has lost over a quarter of [her] rental income just from switching over from short-term to long-term

---

[83] *Mogan v. City of Chicago*, No. 21 C 1846, 2022 WL 4181783, at *5 (N.D. Ill. Sept. 12, 2022) (quoting *Murr v. Wisconsin*, 582 U.S. 383, 395 (2017)); *Nekrilov*, 45 F.4th at 673 ("[T]he economic impact of a regulation is usually measured in terms of its effect on the value of the property.").

[84] *Maritans, Inc. v. United States*, 51 Fed. Cl. 277, 282 (2001) (emphasis added).

And fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts." *Norman v. United States*, 63 Fed. Cl. 231, 270 (2004) (quoting *United States v. Cartwright*, 411 U.S. 546 (1973))).

[85] *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645 (1993) ("[M]ere diminution in the value . . . however serious, is insufficient.").

[86] *Pace Res., Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1031 (3d Cir. 1987).

[87] *Penn. Cent.*, 438 U.S. at 125 (collecting cases); *see also Andrus*, 444 U.S. at 65–66 (Property owners "possess[] a full 'bundle' of property rights, [and] the destruction of one 'strand' of the bundle is not a taking." (citations omitted)).

[88] R. Doc. 12 at 19–20, 29 ¶¶ 68–69, 105.

14

leases."[89] But Guidry also fails to allege facts showing the property's fair market value. Plaintiffs' allegations relate only to the amount of rental profits they hoped to extract from the properties without selling them. Yet the Supreme Court has made clear that, because projected lost profits are inherently speculative, they "provide[] a slender reed upon which to rest a takings claim."[90]

Even if lost profits could be used to measure economic impact, this factor weighs against a regulatory taking because the properties have other economically beneficial uses. Again, plaintiffs can still rent the properties long-term or sell them.[91] They can also live in them, use them as second homes, or use them to provide homes for their families. Courts consistently uphold regulations causing large diminutions in value—including reductions larger than the alleged loss in value here—when the properties generally retain value or economically viable uses.[92]

       2.    *The Ordinance does not interfere with reasonable investment-backed expectations.*

For an investment-backed expectation to form the basis of a regulatory takings claim, the

---

[89]    *Id.* at ¶¶ 73 & 105.

[90]    *Andrus*, 444 U.S. at 66 ("Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform.").

[91]    R. Doc. 12 at 19, 21, 29 ¶¶ 68, 73, & 105.

[92]    *See, e.g.*, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 n.8 (1992) (noting that in some cases property value diminished by 95% may not be a taking); *Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 384 (1926) (upholding zoning law that resulted in 75% diminution in property value); *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915) (finding no taking despite 92.5% diminution in value); *Nekrilov*, 45 F.4th at 674 (finding 50-66% reduction in rental revenue was not a sufficiently severe economic impact, "especially as the properties retain[ed] multiple economically beneficial uses"); *Pulte Home Corp. v. Mongomery Cnty., Md.*, 909 F.3d 685, 696 (4th Cir. 2018) (finding 83% diminution in value was insufficient to establish regulatory taking); *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013) (finding 81% diminution in value was insufficient); *Pace Res., Inc.*, 808 F.2d at 1033 (finding rezoning law that allegedly resulted in 90% reduction in property value was not a taking); *Hignell v. City of New Orleans*, 476 F.Supp.3d 369, 377 (E.D. La. 2020) (holding short-term rental ordinance was not a regulatory taking because plaintiffs "d[id] not have an economically idle investment without the ability to engage in the STR market"; "[p]laintiffs m[ight] reside in these homes or use the properties as long-term rentals"), *vacated on other grounds*, 46 F.4th 317 (5th Cir. 2022).

expectation must be objectively reasonable.[93] "[D]istinct, investment-backed expectations are reasonable *only if* they take into account the power of the state to regulate in the public interest."[94] A plaintiff does not suffer a taking merely because he "ha[s] been denied the ability to exploit a property interest that [the plaintiff] heretofore had believed was available for development."[95] Nor does the Takings Clause mean that "once a property has been devoted to a particular use, the owner has a reasonable expectation of being able to continue with that use."[96]

Here, plaintiffs allege they acquired and invested in their properties solely to use them as short-term rentals and expected they could continue to use their properties this way because "Lafayette had long left short-term rentals untouched[] and only recently (in 2020) sought to regulate them."[97] But if—by 2020—LCG began exploring short-term rental regulations, upon acquiring the properties years later—in 2022—plaintiffs could not have reasonably expected to be forever entitled to use them as short-term rentals.[98] Although the particular ordinance considered in 2020 did not pass, it signaled LCG was interested in regulating short-term rentals (which had expanded only recently as a form of temporary lodging)[99] and might restrict their use in the future, as other municipalities were doing at the time.

---

[93] *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) ("[R]easonable investment-backed expectation[s] must be more than a unilateral expectation or an abstract need." (citation omitted)).

[94] *Nekrilov*, 45 F.4th at 674–75 (emphasis added) (quoting *Pace Res., Inc.*, 808 F.2d at 1033).

[95] *Id.* at 675 (quoting *Penn. Cent. Transp. Co.*, 438 U.S. at 130).

[96] *Id.* (quoting *Pace Res., Inc.*, 808 F.2d at 1032).

[97] R. Doc. 12 at 28 ¶ 103. And plaintiffs here do not allege that LCG encouraged or invited their supposed expectations, such as by making any promise or assurance that Lafayette would *not* regulate short-term rentals. *Cf. Ruckelshaus*, 467 U.S. at 1010–11 (finding defendant reasonably expected that its data would not be publicly disclosed because EPA "explicit[ly] assur[ed]" defendant it would not be).

[98] *See* R. Doc. 12 at 35 ¶ 40 (noting that LCG recognized the need for short-term rental regulation because "technology and innovation have expanded the use and operation of Short Term Rentals").

[99] *Id.*

Indeed, by this time, cities across the country had already banned or otherwise regulated short-term rentals, and courts upheld those bans and regulations.[100] Against this background, plaintiffs could not have reasonably expected to indefinitely use their properties as short-term rentals without restriction. "No person has a vested interest in any rule of law, entitling him to insist that it shall remain unchanged for his benefit."[101] "If every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever."[102] This factor weighs against a regulatory taking.

      3.    *The Ordinance's character is a means of promoting common good and does not effect any physical invasion of plaintiffs' properties.*

The character of the Ordinance also weighs against finding a regulatory taking. For this factor, courts look at the public interest behind the regulation, and advise that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good."[103]

As explained above, the Ordinance is not a physical invasion of plaintiffs' properties.[104] It merely regulates permissible uses of short-term rentals in certain zoning districts to promote the "general welfare, safety, health, peace, good order and economy of Lafayette . . . and to preserve the integrity of Lafayette's neighborhoods."[105] These legitimate and well-founded goals are

---

[100]    *See, e.g.*, *Nekrilov*, 45 F.4th at 665–66 (upholding in 2022 a 2019 ordinance "curtailing the ability of property owners and lease holders to operate short-term rentals").

[101]    *Degan v. Bd. of Trs. of Dallas*, No. 3:17-CV-01596, 2018 WL 4026373, at *8 (N.D. Tex. Mar. 14, 2018) (citing *Custom Seal, Inc. v. Duro-Last Roofing, Inc.*, No. 6:11-CV-122, 2012 WL 12930886, at *5 (E.D. Tex. Sept. 20, 2012)).

[102]    *Id.* (quoting *Landgraf v. USI Film Prod.*, 511 U.S. 244, 269 n.24 (1994)).

[103]    *Penn. Cent. Transp. Co.*, 438 U.S. at 124.

[104]    *See supra* notes 77–82 and accompanying text.

[105]    *See* **Ex. A**, Lafayette's Code of Ordinances § 73-1(a)-(b).

consistent with the overall purpose of Lafayette's zoning districts, which are likewise designed "[t]o promote the public health, safety, morals, and general welfare of the community" by maintaining the character of local neighborhoods.[106] And they are in line with other existing, unchallenged regulations in Lafayette's Development Code—such as its regulation of "home occupations" to "protect[] and maintain[] the residential character of established neighborhoods," and its regulation of local bed and breakfasts.[107] "[C]ourts have long recognized that municipalities may regulate in order to protect communities' residential character[.]"[108] And they have specifically held that "[s]hort-term rental use of a one family home is inconsistent with the zoning purpose of the single-residence zoning district . . . to preserve the residential character of the neighborhood."[109] For this reason, courts have consistently upheld short-term rental laws like the Ordinance that aim to preserve the character of neighborhoods and promote the common good.[110] As a result, the character of the Ordinance weighs against finding a regulatory taking here.

In sum, none of the *Penn Central* factors points to a taking: the Ordinance aims to promote the public good, and plaintiffs fail to allege facts sufficient to show that it severely diminishes their property values, frustrates any objectively reasonable investment-backed expectations, or effects a physical invasion of the properties. Plaintiffs have failed to state a plausible regulatory takings

---

[106]     **Ex. B**, Lafayette Development Code at 15.

[107]     *Id.* at 252–53 & 257–60.

[108]     *Moskovic v. City of New Buffalo*, 638 F.Supp.3d 770, 796 (W.D. Mich. 2022) (collecting cases).

[109]     *Id.*

[110]     *See, e.g., Nekrilov*, 45 F.4th at 678 (upholding "general zoning regulation restricting the permissible uses of residential housing with the goals of protecting the residential housing market in Jersey City and promoting public safety by reducing the nuisance behavior associated with short-term rentals"); *Hause*, 2024 WL 5177512, at *13 (upholding ordinance as "plainly a public program aimed at increasing the burdens on STRs for the benefit of the common good in Fayetteville").

claim, and that claim should be dismissed.[111]

## IV.    The Ordinance does not violate the Equal Protection Clause.

Plaintiffs' equal protection claims likewise warrant dismissal for two reasons. First, plaintiffs do not plausibly allege the existence of similarly situated property owners who are treated differently. Second, Fourteenth Amendment case law rejects the notion that a short-term rental ordinance like this one violates equal protection. Instead, the Ordinance advances the legitimate interest of preserving the fundamentally residential character of single-family neighborhoods.[112]

### C.    Plaintiffs fail to allege the existence of similarly situated persons who are treated differently from them.

"The equal protection clause of the Fourteenth Amendment requires that persons similarly situated be treated the same way."[113]  In other words, unequal treatment of dissimilar persons does not offend equal protection.[114] People are similarly situated only if they "are in all relevant respects alike,"[115] a fundamental aspect of an equal protection claim that plaintiffs miss here.

---

[111]    *See, e.g.*, *Yur-Mar, L.L.C.*, 451 F. App'x at 400–01 (finding appellants failed to allege a "plausible" claim of unconstitutional taking because, although the ordinance at issue had some adverse economic effect on Appellants' businesses, "most of Appellants' possessory rights [were] left intact under the ordinance" and the ordinance "aim[ed] to promote the health, safety, welfare, and morals of the community"); *see also Nekrilov*, 45 F.4th at 669–78 (affirming district court's dismissal of plaintiffs' claim that short-term rental ordinance constituted a regulatory taking because the *Penn Central* factors weighed against it); *Hause*, 2024 WL 5177512, at *13–14 (dismissing plaintiffs' claim that short-term rental ordinance constituted a regulatory taking because "none of the *Penn Central* factors weigh[ed] in favor of finding a taking").

[112]    *Jackson Ct. Condos., Inc. v. City of New Orleans*, 874 F.2d 1070, 1078 (5th Cir. 1989) ("Certainly the protection of residential integrity is a legitimate objective of a zoning regulation."); *accord Vill. of Euclid*, 272 U.S. at 386–87, 390, 394, 397 (recognizing that restrictions on the "use and occupation of private lands in urban communities," including the exclusion of "hotels and apartment houses" in residential areas, as a "valid exercise of authority").

[113]    *Marceaux v. Lafayette City-Par. Consol. Gov't*, 921 F.Supp.2d 605, 633 (W.D. La. 2013).

[114]    *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 513 (5th Cir. 2021).

[115]    *Id.*

### 1.    *Short-term rental operators are not similar to long-term landlords.*

Courts distinguish short-term rentals from long-term rentals; they are simply not "in all relevant aspects alike."[116] A dwelling to which one intends to return as home is different than a short-term rental.[117] The demands on utilities, trash, and parking, along with the value placed on preserving a neighborhood's quality of life, all distinguish single-family homes used for short-term rentals from single-family homes inhabited by long-term tenants.[118] In *Moskovic v. City of New Buffalo*, the Western District of Michigan recently summarized the differences between the two:

> [S]hort-term rentals "operate more akin to commercial lodging and cater to transient populations, vacationers, bachelor/bachelorette parties, and others that have no stake in the community." In contrast, "long-term rentals connote a permanency of residence akin to a homesteaded residence." . . . [by] hous[ing] people who are more likely to contribute to the community.[119]

Put simply, short-term renters do not coach the local little league team, "volunteer at the library, or keep an eye on an elderly neighbor. [T]hey are here today and gone tomorrow."[120] And short-term renters are not traditional "guests"—they're customers.[121] These differences (e.g., no intent to return, no stake in the community, catering commercially to transient visitors, and reducing the supply of housing) mean that short-term rentals and long-term rentals are not suitable comparators

---

[116]    *Moskovic v. City of New Buffalo*, 638 F.Supp.3d 770, 798 (W.D. Mich. 2022) ("Long-term rentals house people who are more likely to contribute to the community. There is a rational basis for treating them differently.").

[117]    *See, e.g., Weisenberg v. Town Bd. of Shelter Island*, 404 F.Supp.3d 720, 729 (E.D.N.Y. 2019) (rejecting that vacation rentals are "dwellings" subject to the Fair Housing Act).

[118]    *Murphy v. Walworth Cnty.*, 383 F.Supp.3d 843, 851 (E.D. Wis. 2019) ("As a threshold matter, the single-family homes used for short-term rentals are not similarly situated as single-family homes used for long-term use.").

[119]    638 F. Supp. 3d 770, 798 (W.D. Mich. 2022) (alterations and citations omitted).

[120]    *Ewing v. City of Carmel-By-The-Sea*, 286 Cal. Rptr. 382, 388, 392 (Cal. Ct. App. 1991) ("Carmel wishes to enhance and maintain the residential character of the R–1 District. Limiting transient commercial use of residential property for remuneration in the R–1 District addresses that goal.").

[121]    *Cf.* R. Doc. 12 at 3 ¶ 9.

for purposes of the Equal Protection Clause.

2. *Residential Single-Family neighborhoods are not similarly situated to Agricultural, Mixed-Use, Commercial, or other neighborhoods.*

Different types and styles of housing, different density levels, and differences in land use (commercial versus residential) are also material differences that preclude properties from being similarly situated.[122] Plaintiffs seek to compare neighborhoods zoned for single-family residences to "all other homeowners" in all other zoning districts.[123] But "all other homeowners" in Lafayette implicates communities of different housing types (i.e., multi-family apartments and condominiums), density ("D" Downtown residents), and residences in mixed-zoning areas ("MN" Mixed-Use Neighborhood).[124] Those fundamental differences mean that homeowners in Residential Single-Family zones are not suitable comparators to "all other homeowners."

3. *Most Lafayette homeowners are equally restricted from operating short-term rentals.*

No equal protection claim exists if a plaintiff has failed to allege facts that raise an inference that the government has "singled out" an individual.[125] Plaintiffs are not treated differently from similarly situated property owners. The Ordinance treats all past and prospective short-term rental operators in Residential Single-Family zones, like plaintiffs, the same as all other homeowners in

---

[122]    *See Clubside, Inc. v. Valentin*, 468 F.3d 144, 160 (2d Cir. 2006) ("Clubside asserts that these differences [in types of housing and density levels] are not material. We disagree . . . These differences of type and scale would impose significantly different burdens on the [local] sewer and water systems."); *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1315 (11th Cir. 2006) ("Because the Campbells sought to build a large residential complex, it would be in error for the court to consider commercial developments . . . to be considered similarly situated.").

[123]    R. Doc. 12 at 12–13 ¶¶ 43–44.

[124]    *See supra* notes 11–22 and accompanying text.

[125]    *Weisenberg*, 404 F.Supp.3d at 732 ("In the absence of allegations raising an inference of such singling out, no equal-protection claim may lie.").

Residential Single-Family zones: neither may operate short-term rentals.[126] So plaintiffs and other short-term rental operators are neither singled out nor exempt from the limits that they concede apply to 75% of Lafayette homeowners.[127]

> ### D.    The Ordinance advances a legitimate government interest.

Plaintiffs assert that the Ordinance deprives them "of their fundamental right to lease the property and their right to include others on the property."[128] But the Ordinance does not infringe on a historical tradition, let alone a fundamental right. Operating a for-profit short-term rental in residential neighborhoods is not a fundamental right.[129] And no court has recognized even a "fundamental right to lease" in the way plaintiffs describe.[130] At most, courts have recognized that the ability to lease property is one of the *privileges* or attributes of ownership.[131]

Yet no historical precedent exists for swaths of single-family homes in residential communities becoming short-term rentals: effectively, empty inns without innkeepers between Monday and Wednesday and nuisances from Thursday through Sunday.[132] Plaintiffs'

---

[126]    *See* R. Doc. 12 at 14 ¶ 50 ("That prohibition applies whether or not homeowners participated in the short-term rental market 'prior to or subsequent to the adoption of' the . . . Ordinance.").

[127]    R. Doc. 12 at 4–5 ¶ 12.

[128]    *Id.* at 1 ¶ 1.

[129]    *E.g.*, *Hanewinckel v. Appelbaum*, No. 15-766, 2016 WL 5661983, at *4 (D. Del. Sept. 29, 2016) ("Plaintiffs' use of their property does not implicate a separately protected constitutional right. Plaintiffs use their property to obtain rental income during the rental season."); *Ewing*, 286 Cal. Rptr. at 393 ("It prohibits the transient commercial use of residential property for remuneration in the R–1 District—regardless of who the parties are. Because Ordinance No. 89–17 focuses on use, rather than users, it does not violate fundamental rights and does not warrant stricter scrutiny than is normally accorded zoning laws.").

[130]    R. Doc. 12 at 20, 22 ¶¶ 70, 76.

[131]    *Terrace v. Thompson*, 263 U.S. 197, 215 (1923) ("The Terraces' property rights in the land include the right to use, lease and dispose of it for lawful purposes."); *Seminole Tribe of Fla. v. Stranburg*, 799 F.3d 1324, 1330 (11th Cir. 2015) ("The ability to lease property is a fundamental privilege of property ownership.").

[132]    Emily Peck and Charles Maldonado, *How Airbnb is pushing locals from New Orleans' coolest neighborhoods: 'We're out of here,'* HUFFPOST AND THE LENS (Nov. 4, 2017), available at https://www.nola.com/how-airbnb-is-pushing-locals-from-new-orleans-coolest-neighborhoods-

proclamations of an "ancient tradition" since "time immemorial" that provides property owners with an unfettered right to "tap[] into the value of their properties"[133] ignores that "[z]oning ordinances and similar regulations on the use of property are presumed valid"[134] and that short-term rentals are "inconsistent with the zoning purpose of the single-residence zoning."[135]

Since the Supreme Court's ruling in *Village of Euclid, Ohio v. Ambler Realty Co.* a century ago, courts routinely uphold a municipality's right to regulate the use of private property to protect a community's residential character.[136] For example, in *Jackson Court Condominiums, Inc. v. City of New Orleans*, the Fifth Circuit rejected an equal protection challenge to New Orleans' ban on vacation time-shares in certain residential districts.[137] The ordinance reflected a concern that "time-share arrangements in residential neighborhoods would increase the noise, littering, and vandalism which might be associated with transient users," which the Fifth Circuit remarked was "[c]ertainly . . . a legitimate objective of a zoning regulation."[138]

---

were-out-of-here/article_f9323868-97cf-5728-a22f-10276ae156a1.html (last visited Aug. 25, 2025) ("[One] street in Treme embodies this new reality: Ten of the 16 homes on her block are licensed as short-term rentals. In Treme, 6 percent of residential addresses have a short-term rental license."); Tom Perkins, '*Like a ghost town': how short-term rentals dim New Orleans' legacy*, THE GUARDIAN (March 13, 2019), available at https://www.theguardian.com/us-news/2019/mar/13/new-orleans-airbnb-treme-short-term-rentals (last visited Aug. 25, 2025) ("For about half of each week, the number of tourists drops and many blocks are "like a ghost town" . . . . Each Thursday, the tourists return, filling hundreds of units. Suddenly, Treme is alive with groups of drunk, mostly white college-aged kids . . . . There are loud parties, overflowing garbage cans and countless other issues 'grating' on remaining residents.").

[133]    R. Doc. 12 at 1–2 ¶¶ 2–3.

[134]    *Schafer v. City of New Orleans*, 743 F.2d 1086, 1089 (5th Cir. 1984) ("Every regulation . . . of property, permanent or temporary, restricts the owner's freedom and may affect the value.").

[135]    *Styller v. Zoning Bd. of Appeals of Lynnfield*, 169 N.E.3d 160, 170–71 (Mass. 2021).

[136]    *Vill. of Euclid, Ohio*, 272 U.S. at 386–87, 390, 394, 397 (Restrictions on the "use and occupation of private lands in urban communities," including the exclusion of "hotels and apartment houses" in residential areas, is a "valid exercise of authority.").

[137]    874 F.2d 1070, 1073, 1079–82 (5th Cir. 1989).

[138]    *Id.* at 1077–78.

Because the Ordinance does not implicate suspect or quasi-suspect classifications or burden a fundamental right, rational-basis review applies.[139] "Under rational basis review, differential treatment 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'"[140] Courts across the country interpreting similar ordinances have held at the pleading stage that such ordinances are a rational means of, for example, "enhancing and maintaining the residential character of [a] community by cutting down on traffic and protecting surrounding property values."[141] Here, LCG's goals are plainly stated in the Ordinance: "to promote, protect and preserve the general welfare, safety, health, peace, good order and economy . . . and to preserve the integrity of Lafayette's neighborhoods."[142] Because the Ordinance serves at least one rational governmental purpose, plaintiffs' equal protection claim fails.

## CONCLUSION

For all the reasons explained above, Michael DeSelle and Rebecca (Becky) Guidry have no constitutional or prudential standing to bring the claims they allege here because they do not own the properties at issue. DeSelle owns only part of an LLC that owns the Saint Joseph property, and Guidry owns only part of an LLC that owns the Steeple Chase property. In any event,

---

[139]   *Id.* at 1079 ("Zoning classifications (at least in the absence of a classification affecting fundamental personal rights or based upon inherently suspect distinctions such as race, religion, or alienage) are subject to the same rational basis analysis utilized in due process claims."); *see also Murphy v. Walworth Cnty.*, 383 F.Supp.3d 843, 850 n.3 (E.D. Wis. 2019) ("The ordinance effectively regulates the short-term rental market; therefore, rational basis review is appropriate.").

[140]   *Madriz-Alvarado v. Ashcroft*, 383 F.3d 321, 332 (5th Cir. 2004).

[141]   *E.g.*, *Short Term Rental Owners Ass'n of Ga., Inc. v. Cooper*, 515 F.Supp.3d 1331, 1347 (N.D. Ga. 2021); *Marfil v. City of New Braunfels, Tex.*, No. 6:20-CV-00248, 2025 WL 243028, at *1 (W.D. Tex. Jan. 10, 2025) ("[T]he ordinance limiting short term rentals seems to meet rational basis by preserving residential character."); *Hutto v. City of Rock Hill*, No. 23-CV-0970, 2025 WL 1189761, at *10 (D.S.C. Mar. 4, 2025) ("The 2023 Ordinance is also rationally related to the City's legitimate goal of mitigating the negative effects of transient occupancy in residential neighborhoods.");

[142]   *See* **Ex. A**, Lafayette's Code of Ordinances 73-1(a)–(b)); *see also* R. Doc. 12 at 16 ¶ 58.

Lafayette's Ordinance is constitutional, and this case should be dismissed.

Respectfully submitted,

s/ Chloé M. Chetta
Judy Y. Barrasso, 2814
Chloé M. Chetta, 37070
Lance W. Waters, 37351
Lorcan L. Connick, 38168
BARRASSO USDIN KUPPERMAN
   FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 2350
New Orleans, LA 70112
Telephone: (504) 589-9700
jbarrasso@barrassousdin.com
cchetta@barrassousdin.com
lwaters@barrassousdin.com
lconnick@barrassousdin.com

*Attorneys for Defendant Lafayette City-Parish Consolidated Government*

25